IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 28, 2005 Session

## LESTER P. PARKER, III v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Blount County**
**No. C-13460      D. Kelly Thomas, Jr., Judge**

—————————

**No. E2004-00584-CCA-R3-PC - Filed October 3, 2005**

—————————

The petitioner, Lester P. Parker, III, appeals the Blount County Circuit Court's denial of post-conviction relief. His post-conviction relief petition attacked his 1997 conviction of attempt to possess cocaine with intent to deliver, as a result of which he received a two-year suspended sentence. His post-conviction claims of the state's suppression of exculpatory evidence and of ineffective assistance of trial counsel are spiced with allegations that the prosecution was the result of conspiratorial retaliation for his championing a fight against corruption in the Alcoa Police Department. The post-conviction court denied relief, and we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Boyd Venable, III, Knoxville, Tennessee; and Michael Meares, Maryville, Tennessee, for the Appellant, Lester P. Parker, III.

Paul G. Summers, Attorney General & Reporter; John H. Bledsoe, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Tammy Harrington and Robert Headrick, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

We glean a summary of the facts underlying the petitioner's conviction of attempt to possess cocaine with intent to deliver from this court's opinion in the petitioner's direct appeal.

> The [petitioner] was employed by the City of Alcoa as an animal control officer. During early 1997, he contacted Joy Hubbard and inquired if she had animals running at large. She replied that she did not. During the conversation, the [petitioner] asked for her phone number and later made several calls to her. Ms. Hubbard eventually

became suspicious that the [petitioner] was involved in illegal drug activity and contacted the Alcoa Police Department. She was told to contact them again if she obtained any additional information. On June 20, 1997, the [petitioner] called Ms. Hubbard, and she contacted the police department. She met with several police officers, and they placed a wire on her. Pursuant to the [petitioner's] instructions, Ms. Hubbard met the [petitioner] at the Rock Gardens Park where she gave him $40.00. The police officers observed and monitored this meeting.

After leaving the park, Ms. Hubbard returned home. Her exhusband and one of the police officers went into her basement. The [petitioner] then arrived at Ms. Hubbard's house. According to Ms. Hubbard and to the officer in the basement, the [petitioner] wanted an aluminum can which she did not have. The [petitioner] then left Ms. Hubbard's home. After he left, a second officer went into the basement. The [petitioner] returned to Ms. Hubbard's house with an aluminum can. He laid small rocks on the can, lit them and used the can to smoke the rocks. A forensic scientist from the T.B.I. Crime Laboratory later identified the residue on the can to be cocaine. The officers in the basement testified that they heard the [petitioner] talking to Ms. Hubbard about drugs. They also heard Ms. Hubbard ask the [petitioner] to give her her part of the drugs. Eventually, the [petitioner] left Ms. Hubbard's home.

The [petitioner] related a rather unusual story. In the way of background, he had previously worked as an informant for the Drug Task Force. He then obtained a job with the sanitation department of the City of Alcoa. While working in that capacity, he filed a lawsuit against the city. He testified that as a part of the settlement of the case, he became the animal control officer.

The [petitioner] testified that when he first met Ms. Hubbard he was on an animal control call. According to the [petitioner], Ms. Hubbard stopped him and told him she wanted to discuss a problem with him. They went to Ms. Hubbard's house, and she brought out a box of records and several cases of micro cassettes. The [petitioner] believed this was evidence of corruption in the Alcoa Police Department. The [petitioner] explained that the reason Ms. Hubbard made him aware of this information was because he had a reputation of one who was not afraid to fight city hall. The [petitioner] testified that he later talked to a city commissioner who told him that he would have to have material evidence to proceed against the police

department. The [petitioner] said that it was his duty to gather evidence against corrupt policemen.

After the initial conversation, the [petitioner] said he saw Ms. Hubbard on several occasions, and she continued to express an interest in turning this information over to him. In mid-June, the [petitioner] told Ms. Hubbard that she should come up with some money so that he could take the information, make copies of it, document it and put it in chronological order. A few days later, they talked again by telephone, and Ms. Hubbard asked the [petitioner] to "front her" some dope. They then agreed to meet in the park. When they met, Ms. Hubbard gave him money and asked him when he was going to get the dope.

After leaving the park, the [petitioner] went to a gas station and bought gas and beer. He then went to Ms. Hubbard's house where she talked to him about drugs. The [petitioner] left and returned. When he returned, Ms. Hubbard offered him a drink of Kool-aid and vodka. The [petitioner] said that after drinking part of it, he felt strange and his thought processes went astray. He believed the drink contained cocaine. He then pretended to smoke cocaine to persuade Ms. Hubbard to give the information about the corrupt cops to him.

The [petitioner] left and was arrested later that night.

The next day, the [petitioner] went to the Blount County Memorial Lab and underwent a drug test which he failed.

*See State v. Lester Parker*, No. E2000-00282-CCA-R3-CD, slip op. at 2-3 (Tenn. Crim. App., Knoxville, Dec. 20, 2000), *perm. app. denied* (Tenn. May 21, 2001). After analyzing the evidence presented at the defendant's trial, this court said, "We find the evidence is clearly sufficient to support the jury's verdict. Direct evidence of the [petitioner's] guilt was presented through several witnesses. The [petitioner] attempted to refute this testimony by a rather incredible story which the jury did not believe."[1] *Id*., slip op. at 3.

In the post-conviction evidentiary hearing, the petitioner testified that his trial counsel failed to call several witnesses who could have enabled him to establish that Joy Hubbard lied about her relationship with Alcoa Police Chief Wayne Chodak. Apparently, the petitioner wanted to establish at trial that the charge against him was trumped up because Chief Chodak wanted to protect

---

[1]The petitioner had testified, that Joy Hubbard put cocaine in the vodka and Kool-aid cocktail she gave him and that, rather than smoke cocaine, he had actually smoked bread crumbs.

his job by preventing the petitioner from revealing that, years earlier, he and Ms. Hubbard engaged in sexual activity when she was under the age of consent. He testified at the evidentiary hearing that he was relying upon his trial counsel to call the witnesses, but that on the day of trial, counsel told him "that the witnesses didn't call him the night before the trial, [so counsel] didn't issue those subpoenas."

The petitioner further opined that, at trial, his counsel underplayed the issue of the police chief's relationship with Ms. Hubbard. He testified that Ms. Hubbard had told him that "she had an affair with Wayne when she was sixteen years old and there was a baby in question." He testified that Ms. Hubbard was alienated from the police chief because he had stopped giving her money. The petitioner added, "At the time, I wasn't aware that she was actually setting me up." He claimed that word had gotten around that he had talked to the Federeal Bureau of Investigation about the police department. The petitioner testified that "there was a reason for Wayne Chodak to stage a conspiracy."

The petitioner testified that the police did not tell him that the aluminum can had been found in the Hubbard home by Donald Hubbard, not the police officers. He opined that the police did not want to reveal Donald Hubbard's role in the case because "he could have blew [sic] their case apart with the fact that he knew [Ms. Hubbard] was having sex with Wayne, as a minor." The petitioner also maintained that Ms. Hubbard was having sexual relations with a number of Alcoa police officers.

The petitioner testified that his trial counsel, who had formerly served as attorney for the City of Alcoa, agreed to pursue the conspiracy theory as a defense to the criminal drug charge against the petitioner, but the petitioner opined that, as a result of counsel's personal and past professional relationship with the city administration, his trial counsel's zeal to pursue the conspiracy defense flagged, and counsel failed to establish the lack of credibility of three prosecution witnesses – Ms. Hubbard and two police officers.

Joy Hubbard next testified on behalf of the petitioner at the evidentiary hearing. She denied that she had told her ex-husband, Donald Hubbard, that she had once had a sexual relationship with Wayne Chodak. She denied having sexual relations with any Alcoa police officer. She further denied that she had told Donald Hubbard that, several years earlier, she had taken "the fall" for a driving under the influence charge when Wayne Chodak had been driving. She denied that Chief Chodak was the father of her first child and that she had ever told Donald Hubbard that the chief was the father. She maintained that the petitioner tried to get her to "write stuff down [about Chief Chodak] that didn't happen. . . . He was . . . trying to get me to write stuff down that he was saying."

Ms. Hubbard testified that the police department paid her $200 to participate in the drug undercover operation against the petitioner. She testified that a few hours after the petitioner smoked cocaine from an aluminum can in her home, she and Donald Hubbard found the can under

a bed. She called the police department and gave the can to an Alcoa officer. She denied that she had ever used drugs.

Donald Hubbard testified for the petitioner by deposition.[2] He testified that he was married to Joy Hubbard for more than a year and that while they were married, she told him that Wayne Chodak was the father of her oldest child. He admitted, however, that Joy Hubbard had also told him that a different person was the child's father. He testified that Joy Hubbard told him that her relationship with Wayne Chodak began when she was arrested for shoplifting at the age of 16 and that she later had a sexual relationship with another Alcoa police officer. He testified that Joy Hubbard continued to enjoy favoritism from the Alcoa Police Department. He testified that Joy Hubbard showed him a "piece of paper signed by Wayne Chodak," which she referred to as her "get-out-of-jail-free pass." He claimed that Joy Hubbard further told him that she had once accepted blame for Wayne Chodak's driving under the influence. He testified that when he and Joy Hubbard were married, Wayne Chodak called her on the telephone "all the time."

Mr. Hubbard testified that Joy Hubbard had told him that she had had a sexual relationship with the petitioner. Mr. Hubbard testified that he was in South Carolina when the petitioner was tried and that neither the prosecutor nor defense counsel spoke with him about the case.

Mr. Hubbard testified that he was in the basement of the Hubbard's Alcoa home on June 20, 1997, the afternoon the petitioner left the aluminum can. According to Mr. Hubbard, earlier that day, Joy Hubbard, serving in an undercover capacity and equipped with recording devices and money furnished by the police, met the petitioner at a park. She gave the petitioner money, and "he was supposed to get the dope and bring it back to the house to her." Joy Hubbard returned to the home, and Mr. Hubbard then waited in the basement with police officers who were conducting surveillance. Later, the petitioner arrived.

Mr. Hubbard testified that, on the following day, as he was vacuuming under the bed, an aluminum can "came rolling out. Well, I picked the can up, . . . and I showed it to Joy, and she immediately called [Detective] Dale Boring . . . ." He testified that, despite a half-hour's search, the police had been unable to find the can the previous day after the petitioner left.

Mr. Hubbard testified that back at the time of this incident, the petitioner was trying to get Wayne Chodak in trouble over his relationship with Joy Hubbard. He stated, "[H]e wanted this on Chodak to, I guess, revenge against him losing his job." Mr. Hubbard testified that the petitioner had been demoted at the police department, "and he was all the time . . . suing the City of Alcoa. He was suing the Alcoa Police Department, and he was all the time suing somebody."

Terry Baker testified for the petitioner that he was married to Joy Hubbard in the 1980's. He testified that Ms. Hubbard talked about having "a relationship" with Wayne Chodak

---

[2]The witness was incarcerated in Columbia, South Carolina.

and that this relationship with Chief Chodak was one of the reasons they divorced. He testified that Joy Hubbard's driving under the influence conviction resulted from her hitting a fence when she was coming to pick up Mr. Baker at his parents' house. Mr. Baker believed that he was the father of Joy Hubbard's oldest child, but he acknowledged that she once told him that a man named Tom Knowles was the father.

Called by the petitioner, Wayne Chodak testified that, as Alcoa chief of police, the petitioner worked under him as an animal control officer. Chief Chodak acknowledged that he had heard that the petitioner was contacting Joy Hubbard in an effort to get derogatory information about him. He denied that he had ever engaged in sexual activity with Ms. Hubbard and denied that he had once arrested her on a shoplifting charge. He testified that the petitioner is the only person who had ever accused him of having an illicit affair with Joy Hubbard or anyone else. He stated that Joy Hubbard called him several times over the years, that many of the calls related to her complaint that the petitioner was harassing her, and that the others were "law enforcement related."

On cross-examination, Chief Chodak testified that he did not initiate the criminal investigation of the petitioner. He testified that he could not have sired Joy Hubbard's 18-year-old daughter because he had undergone a vasectomy 27 years earlier.

The petitioner called former Alcoa police officer John Swicegood to testify in the evidentiary hearing. He testified that, when he worked as an officer, he once saw Wayne Chodak sitting in a parked car with Joy Hubbard and that she would frequently call Wayne Chodak during the evening shift.

Mr. Swicegood acknowledged that he had been a candidate for chief of police when Wayne Chodak was selected. He testified that Chief Chodak once "rescinded" Mr. Swicegood's promotion from patrol officer to field training officer. He maintained, however, that he left the department with no ill feelings.

Next, Detective Lieutenant Dale Boring of the Alcoa Police Department testified. He denied that Joy Hubbard had engaged in sexual activity with him or that he knew of any such activity between her and any other Alcoa officer. He testified that he had no basis for believing that Joy Hubbard and Wayne Chodak had a relationship. He testified that when the Hubbards found the aluminum can the day following the petitioner's visit, he went to their home and retrieved it. He testified that he was probably the one who took the can to the crime laboratory for analysis and was probably the one who returned it to the police department following analysis.

Former Alcoa police officer William Donnie Vance testified in the evidentiary hearing and characterized Ms. Hubbard as a "uniform freak," someone who "likes police officers." He testified that "roughly" in 1985, he saw Detective Boring in a sexually compromising situation with Ms. Hubbard. He also testified that he saw Wayne Chodak visiting Ms. Hubbard when she worked as a clerk at a convenience store in Powell, north of Knoxville.

Mr. Vance admitted that he resigned from the Alcoa Police Department "prior to being terminated over several small trumped-up charges." He testified that the department's "trumping up" charges against officers was a well known fact. Bill Thomas was the chief at the time he resigned. He testified that Chief Thomas advised him to resign because Wayne Chodak was "after" Mr. Vance and that Mr. Vance could "eat a bullet if [he didn't] resign."

Called by the state, the petitioner's trial counsel testified that he was appointed to defend the drug charge in circuit court. He testified that he received discovery materials from the state, including toxicology reports. He recalled moving to suppress the results of the petitioner's drug test, but the trial court overruled the motion. He opined that the admission of the drug test meant that the petitioner needed to testify and that, in any event, the petitioner "was pretty set on testifying."

Trial counsel acknowledged that the defense theory was that the petitioner was "being set up." He recalled that the defense theory was based upon "hanky-panky going on between Chief Chodak and Joy Hubbard, and that this prosecution was basically a retaliation for that." He testified that he had subpoenaed Chief Chodak and the Blount County Sheriff, but these subpoenas were quashed. He did not recall the petitioner's proposing any other witnesses.

Trial counsel rejected the notion that he should have sought Donald Hubbard to be a witness. He stated that Joy Hubbard was present when the aluminum can was found and that, therefore, Donald Hubbard's role as a link in the custody chain of the can was superfluous. Moreover, counsel opined that showing the jury that Mr. Hubbard, a civilian, was in the Hubbard basement with the secluded police officers would belie the defense theory that the police were fabricating a case against the petitioner.

Counsel opined that the tapes of the petitioner's conversations with Ms. Hubbard were not flattering to the petitioner. Counsel conjectured, however, that the "critical thing is when [the petitioner] began explaining [on cross-examination] about the bread crumbs . . . . I think that was a significant point in his testimony."

On cross-examination, trial counsel testified that between 1989 and 1997 he was associated in law practice with a lawyer who was the Alcoa city attorney. He acknowledged that he had acted as a prosecutor in the Alcoa municipal court but stated that he "didn't deal very much with the police side of it." He testified that he had left the law firm before being appointed to represent the petitioner. He stated that the petitioner knew that he had performed legal services for the City of Alcoa and that counsel's mother worked at city hall. Counsel opined that he felt no allegiance to the City of Alcoa and "thought that perhaps [his former] affiliation might actually help [the petitioner]." Counsel opined that at trial he cross-examined prosecution witnesses vigorously and that his connection to the City of Alcoa did not bother him. Counsel acknowledged that he obtained no written waiver from the petitioner.

Counsel believed that he had interviewed witnesses prior to trial but could not specifically recall any interviews. Although approximately ten witnesses were subpoenaed by the defense to testify at trial, counsel only utilized the petitioner and his brother as witnesses. He opined that using "150 people" to show a relationship between Wayne Chodak and Joy Hubbard "wouldn't have made any difference." He expressed his view that he did not have to *prove* that a relationship existed between Wayne Chodak and Joy Hubbard to effectively defend the criminal charge against the petitioner and that "up until the bread crumbs . . . we would have gotten an acquittal."

Counsel testified that the state made no pretrial disclosure that Donald Hubbard had found the aluminum can in the Hubbard home.

Counsel acknowledged that he "probably" did not challenge the state's proof establishing a chain of custody for the aluminum can. He believed that the state established a sufficient chain of custody.

After the petitioner's trial, counsel moved for leave to withdraw from the case, in part, because he had returned to the law firm that represented the City of Alcoa. Nevertheless, counsel represented the petitioner through his direct appeal.

Following this testimony, the petitioner returned to the witness stand to rebut the testimony of Joy Hubbard via tape recordings he made of his discussions with her following his trial. He testified that the conversations revealed that Joy Hubbard did hold documentary evidence of her relationship with Wayne Chodak and that she was the one who initiated the discussions with the petitioner about buying drugs.

In its written order adjudicating the issues raised in the post-conviction petition, the post-conviction court found that the state had denied the petitioner due process by not revealing the information possessed by Donald Hubbard and that the petitioner's trial counsel rendered deficient performance by failing to interview Donald Hubbard and by failing to challenge the chain of custody of the aluminum can, "which, given the testimony at trial, very well might have been excluded." Nevertheless, the court denied post-conviction relief because the petitioner failed to demonstrate prejudice in view of the petitioner's testimony at trial, which "so completely convinced the jury of his guilt that no amount of damage to the credibility of Joy Hubbard or Dale Boring would overcome it." In conclusion, the court held, "Due to the extremely unusual facts of this case, the constitutional violations suffered by the petitioner would, if righted, not result in a different result."

On appeal, the petitioner posits that, but for the withholding of material evidence, the outcome of the trial would have been different and that the record supports a finding of ineffective assistance of counsel.

In post-conviction proceedings, the petitioner has the burden of proving by clear and convincing evidence the claims raised. Tenn. Code Ann. § 40-30-110(f) (2003). On appeal, the lower court's findings of fact are reviewed *de novo* with a presumption of correctness that may only

be overcome if the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). "Claims of ineffective assistance of counsel are considered mixed questions of law and fact and are subject to de novo review." *Serrano v. State,* 133 S.W.3d 599, 603 (Tenn. 2004); *see State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

*I.  Due Process Claims*.

A.  Unspecified Due Process Claim.

In his brief, the petitioner asserts that his due process rights were abrogated at trial because the petitioner did not know about and did not utilize the information possessed by Donald Hubbard, Terry Baker, and former officers Swicegood and Vance.   In this section of his brief, however, the petitioner fails to cite to authority to support his claim that circumstances surrounding the absence of these witnesses equate to a denial of due process of law.  Although he offers legal bases as to why the testimony of some of these witnesses might have been admissible, he affords us no legal bases for adjudicating a denial of due process.  In this situation, this general claim of a denial of due process related to all of these witnesses is waived.  *See* R. Tenn. Ct. Crim. App. 10(b).

B.  *Brady* Due Process Claim.

In a separate section of his brief, however, the petitioner argues that the state's withholding the information that Donald Hubbard could have impeached Joy Hubbard and that he was the person who found the aluminum can violated principles of due process.  For this proposition, the petitioner relies upon the lodestar of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

In *Brady*, the United States Supreme Court held that the prosecution has a constitutional duty to furnish an accused with exculpatory evidence pertaining to either the accused's guilt or innocence and to the punishment that may be imposed.  Failure to reveal exculpatory evidence violates due process when the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution.  *Id.* at 87, 83 S. Ct. at 1196-97. Suppression by the prosecution of exculpatory evidence violates not only the Fourteenth Amendment's due process guarantee to a fair trial, but also the Tennessee Constitution's "Law of the Land" Clause.  *See State v. Ferguson*, 2 S.W.3d 912, 915 (Tenn. 1999).

To obtain post-conviction relief on this basis, the petitioner bears the burden of proving the following:

> (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not);
>
> (2) that the state suppressed the information;

-9-

(3) that the information was favorable to the accused; and

(4) that the information was material.

*Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001); *see State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995).

The materiality aspect of a *Brady* claim is governed by the same prejudice standard as an ineffective assistance of counsel claim; that is, a defendant must show that there is a reasonable probability that the result of the proceedings would have been different. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). Materiality does not demand a showing by a preponderance that the suppressed evidence would have resulted in the defendant's acquittal. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566 (1995); *Johnson v. State*, 38 S.W.3d 52, 58 (Tenn. 2001). Moreover, materiality is not an evidence sufficiency test. *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566; *Johnson*, 38 S.W.3d at 58. Once constitutional error has been found, there is no need for further harmless-error review. *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566; *Johnson*, 38 S.W.3d at 63. Finally, the "suppressed evidence [is to be] considered collectively, not item by item" to gauge materiality. *Kyles*, 514 U.S. at 436, 115 S. Ct. at 1567. Plainly stated, establishing materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S. Ct. at 1566; *see Johnson*, 38 S.W.3d at 58.

Impeachment evidence is treated no differently than other evidence in terms of exculpatory significance. "Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley*, 473 U.S. at 676, 105 S. Ct. at 3380. Impeachment evidence is "'evidence favorable to an accused,' . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.,* 105 S. Ct. at 3380.

The gist of the *Brady* argument is that the state withheld information that Donald Hubbard was the sole person who found the aluminum can and that Mr. Hubbard held knowledge that would impeach Joy Hubbard. We look at these claims separately.

(1) Chain-of-custody claim.

Regarding withholding information that Donald Hubbard acted alone in finding the can, we are unable to conclude that the record supports a finding that the state suppressed the information. Detective Boring was the person the Hubbards called about the discovery of the can, and Detective Boring retrieved the can from the Hubbard residence. Although Donald Hubbard testified through his deposition that he found the can, Joy Hubbard testified that she and Donald Hubbard found the can together and that she gave it to Detective Boring. Detective Boring testified at the evidentiary hearing that he did not recall which one of the Hubbards called him, and he was not positive who gave him the can when he arrived, although he assumed it may have been Donald Hubbard because he knew that Donald Hubbard's fingerprints would appear on the can. The

-10-

detective recalled that the can was found under a bed but did not recall whether Donald Hubbard said he had found it.

If indeed the post-conviction court found that the state had knowledge that Donald Hubbard was the sole finder of the aluminum can, we conclude that the evidence preponderates against such a finding. Detective Boring disavowed any such knowledge, and Donald Hubbard himself testified that no one questioned him about the case. We hold that the petitioner did not show by clear and convincing evidence that the state knew about Donald Hubbard's claim to have been the sole finder of the can. It follows that the state could not have suppressed that of which it had no knowledge.

We also fail to discern a basis for holding that Donald Hubbard's claims about the aluminum can were material. We comprehend that, had the defense been aware that Donald Hubbard would have testified consistently with his post-conviction deposition, the information may have been utilized on at least one of two levels. The defense may have challenged the admissibility of the aluminum can based upon Donald Hubbard being a missing link in the state's chain of custody, and if that failed, the defense presumably could have argued against the authenticity of the evidence on the basis of Donald Hubbard's opportunity to fabricate evidence. Nonetheless, we are unconvinced that Donald Hubbard's information as revealed in the deposition was material.

In order for the defense to have mounted a challenge to the chain of custody based upon Donald Hubbard's claim of discovering the aluminum can, it would have had to have produced Mr. Hubbard; Joy Hubbard apparently would have testified that she was present when the can was found and that she delivered it to Detective Boring. The appearance of Donald Hubbard as a witness in the context of a challenge to the chain of custody, however, would have no doubt resulted in the state's utilization of him as a provisional custody witness. Furthermore, we recognize that Donald Hubbard's account of finding the can, although differing from that of Joy Hubbard as to method of discovery, does not differ from Joy Hubbard's account *as to the derivation of the can*. Donald Hubbard did not claim that the can was somewhere other than under the bed where Joy Hubbard saw the petitioner throw it, and Donald Hubbard provided no information that suggested that the relationship of the can to the petitioner was fabricated. Indeed, Joy Hubbard had an equal opportunity to fabricate evidence by putting the can under the bed. From the standpoint of admissibility, Donald Hubbard's presence at trial would have added nothing except to cause the state to cover the contingency that he was an indispensable link in the chain of custody.

From the standpoint of the weight of the evidence as considered by the jury, we again stress that Donald Hubbard had no information that contradicted Joy Hubbard's account of why the can was found behind or under the bed. Certainly, had Donald Hubbard's claimed role in finding the can been known by the defense at the time of trial, the defense could have argued that Hubbard could have fabricated the evidence. We point out, however, that, at least at trial, the defense was aware of Donald Hubbard's presence in the house during the petitioner's visit because Blount County Sheriff's Deputy Scott Johnson, who operated the recording equipment in the basement, testified at trial that Mr. Hubbard was there with him. Moreover, as pointed out above, the

-11-

aluminum can as evidence was as vulnerable to a claim that Joy Hubbard, as opposed to Donald Hubbard, contrived the evidence. In these circumstances, Donald Hubbard's information as revealed in the deposition was not material in the *Brady* sense.

Based upon a lack of state suppression and of materiality, we hold that no *Brady* due process violation occurred with respect to the admissibility or weight of the aluminum can as evidence.

(2) Impeachment claim.

Next, we examine the claim that Donald Hubbard's deposition revealed information that would have served to impeach Joy Hubbard as a trial witness. Certainly, Donald Hubbard claimed that Joy Hubbard told him details about her relationship with Wayne Chodak that contradicted both her trial and evidentiary hearing testimony. Also, assuming that the defense could have satisfied the rigors of Tennessee Rule of Evidence 613(b) in impeaching a witness via extrinsic evidence of a prior inconsistent statement, the prospective impeachment of prosecution witness Joy Hubbard would qualify as exculpatory for purposes of a *Brady* claim. *See State v. Leach,* 148 S.W.3d 42, 56 (Tenn. 2004) ("Under the collateral fact rule, the statement of a witness made during cross-examination as to a collateral fact may not be impeached by extrinsic evidence of a prior inconsistent statement as to that fact"); *see Bagley*, 473 U.S. at 675, 105 S. Ct. at 3380. We see no basis, however, for concluding that the state suppressed this information because the petitioner has failed to establish that the state was aware of Donald Hubbard's claims about Joy Hubbard's relationship with Wayne Chodak.

For this reason, we cannot conclude that the petitioner proved by clear and convincing evidence that the state violated the principles of *Brady* because it did not reveal to him before trial the knowledge claimed by Donald Hubbard.

We note that had a *Brady* violation been established, the post-conviction court should not have undertaken a harmless error analysis. *See Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566.

Ultimately, we affirm the post-conviction court in its denial of relief on the *Brady* claim, but we do so on the ground that *Brady* violations are not established in the post-conviction record and not because any *Brady* violation was harmless.

*II. Ineffective Assistance of Counsel.*

The petitioner espouses on appeal that his trial counsel rendered ineffective assistance of counsel because (1) counsel had a conflict of interests in representing the petitioner at trial, (2) he failed to call available witnesses to support the petitioner's claim of corruption in the Alcoa Police Department, and (3) he failed to require the state to establish a chain of custody of the aluminum can. The trial court's findings of deficient performance of counsel related to his failure to interview Donald Hubbard and his failure to challenge the chain of custody of the aluminum can.

When a petitioner challenges the effective assistance of counsel, he has the burden of establishing (1) deficient representation and (2) prejudice resulting from that deficiency. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Deficient representation occurs when counsel's services fall below the range of competence demanded of attorneys in criminal cases. *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991). Prejudice is the reasonable likelihood that, but for deficient representation, the outcome of the proceedings would have been different. *Overton v. State*, 874 S.W.2d 6, 11 (Tenn. 1994). Courts need not address both *Strickland* components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). On review, there is a strong presumption of satisfactory representation. *Barr v. State*, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995).

In evaluating counsel's performance, this court should not examine every allegedly deficient act or omission in isolation, but rather we view the performance in the context of the case as a whole. *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The primary concern of the court should be the fundamental fairness of the proceeding being challenged. *Id.* Therefore, this court should not second-guess tactical and strategic decisions of defense counsel. *Henley*, 960 S.W.2d at 579. Instead, this court must reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time. *Id.*; *see also Irick v. State*, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). A court must

> "consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated trivial effect. . . ."

*Henley*, 960 S.W.2d at 580 (quoting *Strickland*, 466 U.S. at 696-97, 104 S. Ct. at 2069).

A. Conflict of Interests.

The petitioner argues that his trial counsel was conflicted in his representation of the petitioner at trial because of his professional and personal affiliation with the City of Alcoa. The petitioner cited counsel's (1) former representation of municipal interests as an associate in a law firm that represented the city and (2) counsel's mother's position as an administrative assistant to the city manager.

Ineffective assistance of counsel may result if counsel's performance is affected by a conflict of interests. *Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067. This conflict, however, must be more than just a potential conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708 (1980). "An actual conflict of interest is usually defined in the context of one attorney representing two or more parties with divergent interests." *State v. Tate*, 925 S.W.2d 548, 552

(Tenn. Crim. App. 1995). Prejudice is presumed "if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067; *Netters v. State*, 957 S.W.2d 844, 847 (Tenn. Crim. App. 1997). To establish a claim based upon conflict of interests, the conflict must be actual and significant, not irrelevant or "merely hypothetical." *Howard Clifton Kirby v. State*, No. 03C01-9303-CR-00074, slip op. at 4 (Tenn. Crim. App., Knoxville, Sept. 28, 1994), *perm. app. denied* (Tenn. 1995).

We begin our analysis by noting that the post-conviction court did not find deficient performance based upon a conflict of interests. The court made no finding at all relative to a conflict of interests apparently because the issue was not raised in the pleadings and was not addressed by post-conviction counsel in their arguments.[3] In this situation, the claim on appeal is waived. Generally, this court does not address issues in post-conviction cases "that were not raised in the petition or addressed in the post-conviction court." *Rickman v. State*, 972 S.W.2d 687, 691 (Tenn. Crim. App. 1997); *see* Tenn. R. App. P. 36(a) (precluding appellate relief "in contravention of the province of the trier of fact").

In any event, the petitioner failed to establish that an actual and significant conflict of interests occurred, and he has failed to cite to authority on appeal that would convince us otherwise. When trial counsel undertook the petitioner's defense by appointment, he had previously terminated his association with the law firm that represented the City of Alcoa. His mother's employment in the city manager's office may have signified a potential conflict, but the petitioner failed to establish that the potential had ever ripened into an actual and significant conflict. Counsel testified that the petitioner was aware of both connections to the City of Alcoa, and based upon counsel's testimony, he believed that counsel's insights into municipal operations would benefit the defense. He affirmatively denied that his associations with the municipality "bothered" him at all.

## B.  Failure to Call Witnesses.

The petitioner claims that counsel performed deficiently in failing to call witnesses who could have attested to the corruption in the Alcoa Police Department.

Waiver aside, we note that the post-conviction court did not find that trial counsel performed deficiently in failing to call witnesses who were available. The witnesses presented by the petitioner at the evidentiary hearing evinced knowledge that, if admissible at trial, might have impeached Joy Hubbard's trial testimony that claims of her relationship with Wayne Chodak were groundless. These witnesses could not have impeached Wayne Chodak because he did not testify at trial. Nor could they have impeached Detective Boring, whose trial testimony did not touch upon his personal relationship with Joy Hubbard; evidence of a sexual relationship between Detective Boring and Joy Hubbard would apparently have been collateral and inadmissible. *See Leach*, 148

---

[3] We acknowledge that post-conviction counsel did elicit testimony from trial counsel which provides the factual basis for the petitioner's appellate claims that counsel had a conflict of interests.

S.W.3d at 56. Essentially, in the evidentiary hearing, the petitioner established no corruption in the Alcoa Police Department, except to offer claims that Wayne Chodak and Dale Boring lied in their post-conviction testimony – a fact not found by the post-conviction court – and that Wayne Chodak committed a criminal offense of statutory rape some 20 years earlier and sought to cover it up – a claim that was left unproven in the evidentiary hearing. We cannot see how the evidence offered at the evidentiary hearing, if even admissible at trial, could have blossomed into poignant substantive evidence for the defense. Trial counsel apparently concluded that the defense predicated upon claims of a cover-up and a conspiracy against the petitioner were untenable. We tend to agree. At any rate, counsel determined not to call available witnesses, the post-conviction court failed to find deficient performance on this point, and the record lends support to an inference that counsel made a tactical decision not to sponsor testimony in a vain, if not self-destructive, attempt to establish a conspiracy.

## C. Failure to Challenge Chain of Custody.

In his third appellate claim of ineffective assistance, the petitioner posits that counsel failed to challenge the admissibility of the aluminum "crack" can. Apparently, he claims that the evidence was inadmissible because a chain-of-custody witness, Donald Hubbard, was absent at trial. We cannot be certain of the specifics of this claim because they are not elucidated in the petitioner's brief. As in the case of the failure to call witnesses, the failure to challenge the chain of custody of evidence is mentioned only topically and is, accordingly, waived. *See* R. Tenn. Ct. Crim. App. 10(b).

We recognize, however, that the post-conviction court did find that counsel performed deficiently on the issue of the chain of custody, and we pause to consider what merit lies in this issue had it not been waived. The petitioner's difficulty in pointing to Donald Hubbard's absence as a chain-of-custody witness is that the same witness whose testimony could create a problem about the initiation of the chain of custody is also the witness whose presence and testimony would provide the solution. As we noted above, we have no doubt that had Donald Hubbard's claim to have solely found the aluminum can come to light and had the defense contested the chain of custody, the state would have supplemented its apparently ready-in-waiting evidence of the chain of custody by including the provisional testimony of Donald Hubbard. Moreover, the petitioner has cited no other potential flaws in the chain of custody, and we discern none. Although the post-conviction court expressed concern that the chain of custody was intact based upon "trial" testimony, we recognize that the issue was not joined at trial. Had it been, we surmise that the available evidence would have warranted admission of the can.

Even if it had been held inadmissible, we believe that the post-conviction court's rationale for denying post-conviction relief – that the petitioner experienced no prejudice – is sound. In our view, the state presented enough evidence of the conviction offense *without* the "crack" can

to create a jury question of guilt.[4]  Based on counsel's testimony, the petitioner was apparently eager to testify, and the admission of drug test results – not the  admission of the aluminum can – was the event that caused counsel to favor the petitioner's testifying.  Once he testified, the case was lost, and our conclusion in this respect is shared not only by trial counsel, but also by the post-conviction judge (who was also the trial judge) and by a panel of this court on direct appeal.  The post-conviction court concluded that not even an effective challenge to the chain of custody of the "crack" can would have yielded a different result at trial.  We agree.

### III. Conclusion.

We find no basis for reversing the post-conviction court and affirm its order.

_____
JAMES CURWOOD WITT, JR., JUDGE

---

[4]The state admitted tape recordings in which the petitioner discussed money and drugs with Joy Hubbard. Evidence showed that Ms. Hubbard met the petitioner surreptitiously at a park and gave him $40.  Later, he came to Joy Hubbard's residence, and the discussion of drugs ensued.  An officer who had waited in the basement testified that he heard the petitioner ask for an aluminum can and that aluminum cans were commonly used as devices for smoking crack cocaine.  An officer heard a noise that sounded like someone inhaling.  The next day, the petitioner's blood test yielded a positive result for the presence of cocaine.